**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

EUGENE HUNT, et al.,

*Plaintiffs*,

v.

STATE OF ARKANSAS, et al.,

*Defendants*.

Civil Action No. 5:89-cv-406

# BRIEF IN SUPPORT OF MOTION TO TERMINATE, OR IN THE ALTERNATIVE MODIFY, CONSENT DECREE

# Table of Contents


**Table of Contents** ..... i

**Table of Authorities** ..... iii

**Introduction** ..... 1

**Background** ..... 2

**A. Factual Background** ..... 2

**B. Legal Background** ..... 5

**C. The Current Motion** ..... 6

**Legal Standard** ..... 7

**I. The Consent Decree Must Be Terminated under the *Rufo* Framework Because Circumstances Have Substantially Changed Since It Was Entered 35 Years Ago and Termination is Suitably Tailored to Those Circumstances** ..... 7

**A. After *Callais*, there is no doubt that segregating Arkansas voters into race-based judicial subdistricts is unconstitutional** ..... 9

***1. There is no compelling interest for the consent decree to categorize Arkansans on the basis of their skin color under current precedent*** ..... 9

***2. The consent decree is not narrowly tailored under current precedent*** ..... 12

**B. Misunderstandings of governing law also necessitate modification of the consent decree** ..... 12

**II. Defendants' 35 Years of Good-Faith Compliance with the Consent Decree Independently Requires the Consent Decree to be Terminated** ..... 14

**A. The consent decree's specific terms contemplated federal control ending long ago, and Defendants' decades-long, good-faith compliance with the consent decree requires a return to local control** ..... 15

**B. The consent decree's underlying goal of creating race-based subdistricts is beyond the Court's authority because it is unconstitutional** ..... 18

**C. There is no continuing efficacy in maintaining federally mandated, racially segregated judicial subdistricts ........ 19**

**Conclusion ........ 20**

## TABLE OF AUTHORITIES

***Cases*** **Pages**

*Abbot v. League of United Latin Am. Citizens*,
146 S. Ct. 418 (2025) .......... 11

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024) .......... 5–6, 9, 11

*Bd. of Educ. of Okla. City Pub. Schs. v. Dowell*,
498 U.S. 237 (1991) .......... 1, 7, 14–16, 19–20

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) .......... 9, 12

*Cody v. Hillard*,
139 F.3d 1197 (8th Cir. 1998) .......... 14–19

*Ctr. for Biological Diversity v. Strommen*,
114 F.4th 939 (8th Cir. 2024) .......... 14

*Daniels v. Woodbury County*,
742 F.2d 1128 (8th Cir. 1984) .......... 13

*Frew ex rel. Frew v. Hawkins*,
540 U.S. 431 (2004) .......... 14–15, 19

*Holder v. Hall*,
512 U.S. 874 (1994) .......... 18

*Horne v. Flores*,
557 U.S. 433 (2009) .......... 20

*Jeffers v. Clinton*,
730 F. Supp. 196 (E.D. Ark. 1989) .......... 13

*Jeffers v. Tucker*,
847 F. Supp. 655 (E.D. Ark. 1994) .......... 13

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
478 U.S. 501 (1986) .......... 14

*Louisiana v. Callais*,
146 S. Ct. 1131 (2026) .......... 1, 5–6, 9–13, 18–19

*McDonald v. Carnahan*,
109 F.3d 1319 (8th Cir. 1997) .......... 15–16, 18–19

*Miller v. Johnson*,
515 U.S. 900 (1995) .......... 1, 18–19

*Milliken v. Bradley*,
433 U.S. 267 (1977) .......... 19

*Milton v. Huckabee*,
No. 88-cv-01142 (W.D. Ark. Sep. 30, 2026) .......... 7, 16–17

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007) .......... 19

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) .......... 7–8, 12

*Shelby County v. Holder*,
570 U.S. 529 (2013) .......... 12

*Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*,
769 F.3d 566 (8th Cir. 2014) .......... 7–8, 12–13, 15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (SFFA)*,
600 U.S. 181 (2023) .......... 1, 9–10, 12, 18–19

*Thornburg v. Gingles*,
478 U.S. 30 (1986) .......... 6, 10, 13, 18

*United States v. Junction City Sch. Dist.*,
14 F.4th 658 (8th Cir. 2021) .......... 7, 14

*White v. Nat'l Football League*,
585 F.3d 1129 (8th Cir. 2009) .......... 8, 12

**Rules & Statutes**

42 U.S.C. § 1973 .......... 2, 5–6, 9–10, 13–14, 18–19

52 U.S.C. § 10301 .......... 2

Fed. R. Civ. P. 60 .......... 7

Fed. R. Civ. P. 65 .......... 13

Ark. Const. amend. 80, § 6 ........................................ 4

Ark. Const. amend. 80, § 17 ........................................ 20

Ark. Const. amend. 80, § 19 ........................................ 4, 17

**Other Authorities**

*Arkansas*, Talk Business & Politics (Nov. 28, 2016), https://talkbusiness.net/2016/11/a-short-primer-on-the-gop-ascendancy-in-arkansas/ ........................................ 4, 11

*Circuit Court Districts*, Arkansas Spaciatial Data Infrastructure Portal, https://arcg.is/1C1reT4 (last visited Nov. 2, 2026) ........................................ 6, 16

*QuickFacts, Pulaski County, Arkansas*, United States Census Bureau, https://www.census.gov/quickfacts/fact/table/pulaskicountyarkansas/PST045225 (last visited Nov. 4, 2026) ........................................ 4

## Introduction

For three-and-a-half decades, the consent decree at issue in this case has required segregating Arkansas voters based on the color of their skin. This racial classification "engages in racial stereotyping at odds with equal protection mandates" and is "odious to a free people whose institutions are founded upon the doctrine of equality." *Louisiana v. Callais*, 146 S. Ct. 1131, 1153 (2026) (first quoting *Miller v. Johnson*, 515 U.S. 900, 920 (1995); then quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*SFFA*), 600 U.S. 181, 208 (2023)). This shameful practice is unlawful, demeans all Arkansans, and must end.

Federal courts' supervision of a State's elections is an extraordinary remedy that must be temporary and targeted at government-sponsored discrimination. *Cf. Bd. of Educ. of Okla. City Pub. Schs. v. Dowell*, 498 U.S. 237, 247–48 (1991) (school systems). Yet the consent decree here has existed since 1991 when the parties agreed to a consent decree requiring the creation of majority-minority electoral subdistricts in several Arkansas judicial circuits. In the ensuing years, there have been significant changes in federal law, massive shifts in demographics, and flipping partisan preferences. Nevertheless, the race-based consent decree endured, and the parties complied with its terms. Because any vestiges of past discrimination have been eliminated and *Callais* has removed any doubt that drawing districts based on race is unconstitutional, the consent decree is an unconstitutional relic. This Court should therefore promptly terminate the consent decree.[1]

[1] Following a good-faith conferral, Plaintiffs oppose this motion at least in part. The parties had meet-and-confer calls on October 9, October 19, and October 26. After the first call, Defendants promptly provided the publicly available election information that Plaintiffs requested. At the second meet-and-confer call on October 19, Plaintiffs indicated that they may agree to the dissolution of some, but not all of the consent decree's subdistricts and that they would communicate their final position by October 21 so that Defendants could file the present motion. But when October 21 came, Plaintiffs, for the first time, took the position that they would not identify which subdistricts they opposed the dissolution of until after they have reviewed the present motion. During the October 26 meet-and-confer call, Plaintiffs confirmed that they intend to oppose the dissolution of some subdistricts but would not identify which subdistricts.

## Background

### A. Factual Background

After the General Assembly created seventeen new judgeships in 1989, private Plaintiffs from several of Arkansas's judicial circuits sued Arkansas itself and a handful of its top officials—Governor Bill Clinton, Secretary of State Bill McCuen, Attorney General Steve Clark, Auditor Jimmy Lou Fisher, and the Chairs of the Senate and House Judiciary Committees, Max Howell and James L. Shaver. *See* Doc. 29, ¶¶ 3–17. Plaintiffs alleged that Defendants violated § 2 of the Voting Rights Act, 42 U.S.C. § 1973 (current version at 52 U.S.C. § 10301), and the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution. *See id.* ¶¶ 39–40. Plaintiffs alleged that Arkansas denied or abridged their right to vote by (1) using a "system of at-large elections for circuit, chancery[,] and juvenile court judges," which had "numbered posts, staggered terms, and a majority vote" *id.* ¶ 39; and (2) using "boundary lines for the circuit, chancery[,] and juvenile court judicial districts" that allegedly "fragment[ed] concentrations of black population thereby diluting black voting strength," *id.* ¶ 40. Plaintiffs' proposed solution to these alleged injuries was to implement alternative districts or subdistricts, with boundaries drawn specifically along racial lines. *See id.* ¶ 36. Plaintiffs, however, later "withdr[ew] their claims of intentional discrimination under the Voting Rights Act and the Fourteenth and Fifteenth Amendments." Doc. 75, at 1; Doc. 81, at 1.

In 1991, the court entered the original consent decree, which the parties had agreed to. Doc. 75. The next year, the district court entered an amended consent decree (the "consent decree"), as the parties requested. Doc. 81. The consent decree created multiple "electoral sub-districts in" the First, Second, Sixth, Tenth, and Eleventh West judicial districts. It further provided that

the judges elected by the voters in those subdistricts would "exercise jurisdiction" throughout the entire circuit. Doc. 81, at 3–5. In other words, judges elected by the voters of one subdistrict would exercise jurisdiction over all the judicial district's residents, including those who resided outside of the judge's electoral subdistrict and thus had no say in electing the judge.

The subdistricts were designed to have specific percentages of voting-age population of specific skin colors: white and black. *Id.* at 3–5. For example, in Judicial District 6, one subdistrict was created to have a 90.00% white voting-age population, while another subdistrict was created to have a 60.38% black voting-age population. *Id.* at 4. Here is how the consent decree divvied up judgeships among the subdistricts in Judicial District 6 (Pulaski and Perry Counties):

| **Majority-White Subdistrict** | **Majority-Black Subdistrict** |
|---|---|
| • 5 circuit judgeships<br>• 5 chancery judgeships<br>• 1 circuit/chancery juvenile judgeship | • 2 circuit judgeships<br>• 1 chancery judgeship<br>• 1 circuit/chancery juvenile judgeship<br>• 1 circuit/chancery judgeship to be created |
| **Total: 11 judgeships** | **Total: 5 judgeships** |

Doc. 81, at 4. Based on the demographics at the time, *see infra* p. 4, the consent decree appears to have attempted to give racial groups a roughly proportional number of judges. And, as is apparent from the consent decree's terms, "race was certainly an important factor in drawing [the] judicial subdistrict lines" in the consent decree. Doc. 93, at 2. In 2002, the district court approved "minimal" changes to the subdistricts based on updated geographical data used by the U.S. Census Bureau. Doc. 107, at 1. The effect on racial "percentages in the sub-districts . . . [was] negligible." *Id.*

Much has changed since 1991. For one, Arkansas merged the courts of law and equity in 2000. Now, instead of separate circuit, chancery, probate, and juvenile courts, the circuit courts exercise jurisdiction over "all justiciable matters not otherwise assigned pursuant to this Constitution." Ark. Const. amend. 80, § 6(A); *see id.* amend. 80, § 19(B)(1) ("The Jurisdiction conferred on Circuit Courts established by this Amendment includes all matters previously cognizable by Circuit, Chancery, Probate and Juvenile Courts . . . ."). Because chancery, probate, and juvenile judges no longer exist in Arkansas, the consent decree has been grafted onto the current system by, for example, giving 11 circuit judgeships to the white-majority subdistrict in the Sixth Judicial Circuit and giving 5 circuit judgeships to the black-majority subdistrict. *See* Ex. 1, at 2–3 (identifying Sixth Judicial Circuit subdistrict judges post-2024 General Election).

Partisan preferences have changed too, with Arkansas Republicans gaining control over Democrats in the early 2010s for the first time in over 100 years. *See* Scott Cashion, *A short primer on the GOP ascendancy in Arkansas*, Talk Business & Politics (Nov. 28, 2016), https://talkbusiness.net/2016/11/a-short-primer-on-the-gop-ascendancy-in-arkansas/. Demographics have also shifted. For example, in 1990, 72.2% of Pulaski County identified as white and 26.4% identified as black. Ex. 2, at 17. Today, 54.2% of Pulaski County identifies as white only, while 37.1% identify as black only. *QuickFacts, Pulaski County, Arkansas*, United States Census Bureau, https://www.census.gov/quickfacts/fact/table/pulaskicountyarkansas/PST045225 (last visited Nov. 4, 2026) (population estimates as of July 1, 2025). Not to mention those in Pulaski County who now identify as more than one race (4.6%), as Asian (3.0%), or as having a Hispanic heritage (9.1%). *Id.*

**B. Legal Background**

The law has also vastly shifted in the 35 years since the consent decree was filed. For example, the Supreme Court in *Callais* clearly established what § 2 of the VRA requires and what the Constitution forbids. In *Callais*, Louisiana was between a rock and a hard place. 146 S. Ct. at 1142. One district court held its congressional map likely violated § 2 because it didn't include another majority-black district, so Louisiana drew a new map to comply with the district court. *Id.* Then, a three-judge panel held Louisiana's new map violated the Equal Protection Clause because it was a racial gerrymander. *Id.* To resolve this tension, the Supreme Court explained that, although "lower courts have sometimes applied . . . § 2 precedents in a way that forces States to engage in the very race-based discrimination that the Constitution forbids," *id.*, "[c]orrectly understood, § 2 does not impose liability at odds with the Constitution," *id.* at 1143. That means that § 2 does not "outlaw a map solely because it fails to provide a sufficient number of majority-minority districts," which would "run headlong into the Act's express disclaimer against racial proportionality." *Id.* at 1156. Instead, "the focus of § 2 must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination." *Id.* at 1155 (emphasis in original). Although intentional discrimination need not be directly proved under § 2, "the circumstances [must] give rise to a strong inference that intentional discrimination occurred." *Id.* at 1156.

After addressing what § 2 requires, the Supreme Court turned back to Louisiana's new map. The Court started by explaining that strict scrutiny applied because Louisiana's underlying goal—"to achieve a black voting-age population over 50%" in the district at issue—was racial. *Id.* at 1161. Because "race played a role in the drawing of district lines," the new map could survive constitutional scrutiny only if it "satisf[ied] the 'extraordinarily onerous' standard of proving that

its use of race was narrowly tailored to further a compelling governmental interest." *Id.* (quoting *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 8, 11 (2024)). Louisiana's map failed that test under an "update[d]" version of the framework from *Thornburg v. Gingles*, 478 U.S. 30 (1986). *Id.* at 1159. There was no alternative "map that met all the State's nonracial goals"; there was no evidence of "racially polarized voting" that "control[led] for partisan preferences"; and the totality of the circumstances did not "show an objective likelihood of intentional discrimination." *Id.* at 1161–62. The Court therefore held that § 2 of the VRA did not require Louisiana to draw district lines based on race and that Louisiana's new map violated the Equal Protection Clause. *Id.* at 1162.

**C. The Current Motion**

Despite these legal developments and the passage of time, the consent decree still requires Defendants to use racially sorted judicial subdistricts. That's because the consent decree has no end date. It does, however, explicitly contemplate Defendants "petition[ing] the Court after January 2, 2001, for an end to the Court's jurisdiction over this case" after complying with the consent decree for several years. Doc. 81, at 10–11. Defendants have complied with the consent decree and maintained the racially sorted subdistricts for the past 35 years. *See, e.g.*, Doc. 107 (in 2002, making "negligible" changes to the original subdistrict boundaries that were then in effect); *Circuit Court Districts*, Arkansas Spaciatial Data Infrastructure Portal, https://arcg.is/1C1reT4 (last visited Nov. 2, 2026) (showing current boundaries for Arkansas circuit court districts); Ex. 3 (overlaying the 2000 Census file with the current circuit court district boundaries, showing that the boundaries are based on the 2000 Census map); Ex. 4 (declaration from Shelby Johnson explaining Exhibit 3's significance and declaring that the boundaries have not been changed to align with subsequent census maps); Ex. 1, at 2–3 (identifying Sixth Judicial Circuit subdistrict judges

post-2024 General Election). But Defendants have not previously exercised the right to petition the Court to end jurisdiction or to terminate the consent decree. As part of a larger effort to end federal supervision of consent decrees in several cases and to "remov[e] these cases from the federal docket," Defendants do so now. *United States v. Junction City Sch. Dist.*, 14 F.4th 658, 668 (8th Cir. 2021); *see Milton v. Huckabee*, No. 88-cv-01142 (W.D. Ark. Sep. 30, 2026) (Order Granting Motion to Terminate Continued Supervision).

## Legal Standard

Consent decrees can be terminated under Federal Rule of Civil Procedure 60(b) for two reasons. *Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*, 769 F.3d 566, 570–72 (8th Cir. 2014). First, a consent decree should be modified in a way that effectively terminates it if there is "a significant change in circumstances [that] warrants revision of the [consent] decree" and termination is "suitably tailored to the changed circumstances." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992); *see also Palestine-Wheatley*, 769 F.3d at 573. Second, a consent decree should be terminated if the State has "complied in good faith with the [consent] decree since it was entered" and the "vestiges" of the underlying constitutional violation "ha[ve] been eliminated to the extent practicable." *Dowell*, 498 U.S. at 249–50.

### I. The Consent Decree Must Be Terminated under the *Rufo* Framework Because Circumstances Have Substantially Changed Since It Was Entered 35 Years Ago and Termination is Suitably Tailored to Those Circumstances.

Applying *Rufo*'s standards, the Court should terminate the consent decree. "The *Rufo* standard has two essential elements, whether 'a significant change in circumstances warrants revision of the decree,' and if so, 'whether the proposed modification is suitably tailored to the changed circumstances.'" *Palestine-Wheatley*, 769 F.3d at 573 (quoting *Rufo*, 502 U.S. at 383).

"Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous." *Rufo*, 502 U.S. at 384. "[M]odification of a consent decree may [also] be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent," *Id.* at 388, or when a decision has "clarifie[d] the law" and the "parties . . . based their agreement on a misunderstanding of the governing law," *id.* at 390. A consent decree, however, "*must* . . . be modified if 'one or more of the obligations placed upon the parties has become impermissible under federal law.'" *White v. Nat'l Football League*, 585 F.3d 1129, 1136 (8th Cir. 2009) (emphasis added) (quoting *Rufo*, 502 U.S. at 388).

"Once a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court should determine whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 391. "[A] modification must not create or perpetuate a constitutional violation," nor should a proposed modification "rewrite a consent decree so that it conforms to the constitutional floor." *Id.* Rather, the proposed modification must be "tailored to resolve the problems created by the change in circumstances." *Id.* If the proposed modification would "relieve the moving party of a consensual commitment that was essential to the original decree," the court "has the power to order a changed-circumstances modification that effectively terminates the decree." *Palestine-Wheatley*, 769 F.3d at 573.

Since 1991, there have been significant changes in federal law that erode whatever ground the consent decree originally stood on. It's now apparent that Defendants' essential obligations under the consent decree are impermissible under federal law and that, as a result, the consent decree must be modified in way that effectively terminates it. Additionally, the consent decree was

based on several misunderstandings of the governing law. These too necessitate effective termination.

### A. After *Callais*, there is no doubt that segregating Arkansas voters into race-based judicial subdistricts is unconstitutional.

The State's obligation under the consent decree to create race-sorted districts is impermissible under federal law. The consent decree expressly divides voters based on their skin color. Thus, the consent decree is constitutional only if it "satisf[ies] the 'extraordinarily onerous' standard of proving that its use of race was narrowly tailored to further a compelling governmental interest." *Callais*, 146 S. Ct. at 1161 (quoting *Alexander*, 602 U.S. at 11). It's clear that the consent decree does not satisfy this standard under recent Supreme Court precedent, especially after *Callais*. Accordingly, the consent decree violates the Equal Protection Clause.

#### ***1. There is no compelling interest for the consent decree to categorize Arkansans on the basis of their skin color under current precedent.***

The Supreme Court has recognized only three compelling interests that allow the government to discriminate based on race: (1) "avoiding imminent and serious risk to human safety in prisons, such as a race riot"; (2) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute"; and (3) "[c]ompliance with § 2, *as properly construed*," which "imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race." *Callais*, 146 S. Ct. at 1143, 1152, 1157 (citations omitted) (emphasis in original); *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 658 (2021) ("[F]acially neutral voting practices violate § 2 only if motivated by a discriminatory purpose."). And even then, to sanction racial classifications, courts

must "dispense temporarily with the Constitution's unambiguous guarantee of equal protection." *SFFA*, 600 U.S. at 212. So "[a]t some point," the racial classification "must end." *Id.*

The consent decree is not supported by any compelling interest. The Court has previously recognized that "the original purpose of the 1992 Amended Consent Decree . . . was designed to create opportunities for African Americans to elect Circuit Court judges in a manner consistent with Section 2 of the Voting Rights Act." Doc. 107, at 1–2. To determine whether such a purpose is compelling, courts look to the "update[d]" "*Gingles* framework." *See Callais*, 146 S. Ct. at 1159, 1161. Under that framework, Plaintiffs must establish four preconditions:

1. The minority community "is 'sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district'";
2. The minority community must be "politically cohesive";
3. The majority community must vote "sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate"; and
4. The "totality of the circumstances" must show "that the political process is not 'equally open' to minority voters."

*Id.* at 1146 (alterations in original) (citations omitted). The consent decree fails "at every step of the *Gingles* framework." *Id.* at 1161.

To satisfy the first precondition of size and compactness, Plaintiffs provided "alternative districting arrangement[s]" in their Third Amended Complaint that were designed with the purpose of creating majority-minority subdistricts. Doc. 29, ¶ 36. And the consent decree used "race [ ]as . . . an important factor in drawing [the] judicial subdistrict[s]" too. Doc. 93, at 2. But an alternative map that "use[s] race as a districting criterion" "sheds no light on whether the State acted unconstitutionally by *not* adopting such a map" because it "would be unconstitutional if a State engaged in such mapmaking." *Callais*, 146 S. Ct. at 1159 (emphasis in original). Nor did

Plaintiffs' alternative map purport to "meet all the State's legitimate districting objectives." *Id.* Without a "viable alternative map," "a dispositive or near-dispositive adverse inference" that Arkansas did not violate the constitution is warranted. *Abbot v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025). Thus, the consent decree fails the first precondition.

To establish the second and third preconditions of political cohesion and majority bloc voting, "plaintiffs must provide an analysis that controls for party affiliation," which is "critical for 'disentangl[ing] race and politics.'" *Callais*, 146 S. Ct. at 1159 (alteration in original) (quoting *Alexander*, 602 U.S. at 6). But the consent decree did not account for party affiliation when it was filed. And now, it fails to account for the fact that Arkansas Republicans gained control over Democrats in the early 2010s. *See* Scott Cashion, *A short primer on the GOP ascendancy in Arkansas*, Talk Business & Politics (Nov. 28, 2016), https://talkbusiness.net/2016/11/a-short-primer-on-the-gop-ascendancy-in-arkansas/; *Callais*, 146 S. Ct. at 1159 ("[S]imply pointing to *inter*-party racial polarization proves nothing." (emphasis in original)).

And for the fourth precondition, the totality of the circumstances must show "more than a remote bearing on . . . present-day intentional racial discrimination regarding voting," which is "what the Fifteenth Amendment prohibits." *Callais*, 146 S. Ct. at 1160. For starters, the consent decree was explicitly *not* based on intentional racial discrimination; Plaintiffs "withdr[ew]" those claims. Doc. 81, at 1. Additionally, the consent decree is not based on present-day data; it is based on data that is three-and-a-half decades old and does not reflect Arkansas today. *See Callais*, 146 S. Ct. at 1160 ("Discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing effects of societal discrimination, are entitled to much less weight." (citation modified)). Demographics have shifted, and partisan preferences have flipped.

*See supra* p. 4. So even if the consent decree had properly addressed intentional discrimination that existed in 1991, it is now based on "decades-old data relevant to decades-old problems," not "current conditions." *Callais*, 146 S. Ct. at 1162 (quoting *Shelby County v. Holder*, 570 U.S. 529, 553 (2013)). There is thus no compelling interest justifying the consent decree's division of Arkansans based on race.

#### *2. The consent decree is not narrowly tailored under current precedent.*

Even if the consent decree had a compelling interest, it is not narrowly tailored. It has no end date and purports to place Arkansas officials under indefinite federal supervision. *See* Doc. 81. It draws race-based subdistricts, which silently papers over "countless differences" between individuals. *SFFA*, 600 U.S. at 291–92 (Gorsuch, J., concurring). And it does not account for a host of relevant factors, including changing demographics and partisan preferences and a lack of present-day data supporting the decree. *See supra* p. 4.

Following the Supreme Court's decision in *Callais* and other cases (*e.g.*, *Brnovich*, *SFFA*, *Shelby County*), the State's obligation under the consent decree to create racially-sorted districts is clearly unconstitutional. No modification can fix that problem. *See Palestine-Wheatley*, 769 F.3d at 572 (explaining that a "modification must not create or perpetuate a constitutional violation" (citation modified)). Because this obligation was "essential to the original decree," the consent decree must be effectively terminated. *Id.* at 573.

### B. Misunderstandings of governing law also necessitate modification of the consent decree.

The consent decree was based on several misunderstandings of governing law. *White*, 585 F.3d at 1136 ("'[A] court that takes *Rufo* seriously' must consider altering a consent decree . . . if the agreement was based on a misunderstanding of governing law." (quoting *Gavin,* 122 F.3d at

1088)). For one, it was based on a misunderstanding of what § 2 requires. Following the Supreme Court's *Gingles* decision in 1986, some district court courts interpreted § 2 to require States to create majority-minority districts. *See Jeffers v. Tucker*, 847 F. Supp. 655, 657 (E.D. Ark. 1994) ("[W]e should draw as many [majority-minority districts] as can reasonably be done." (citation modified)); *see also Jeffers v. Clinton*, 730 F. Supp. 196, 205 (E.D. Ark. 1989) ("If . . . reasonably compact and contiguous majority-black districts could have been drawn . . . , the outlines of a Section 2 theory are made out."). But as *Callais* explained, that is incorrect. *See Callais*, 146 S. Ct. at 1156 ("[S]uch an interpretation would run headlong into the Act's express disclaimer against racial proportionality."). Instead, § 2 is focused on "the Fifteenth Amendment's prohibition on *intentional* racial discrimination" and thus at least requires "circumstances [that] give rise to a strong inference that intentional discrimination occurred." 146 S. Ct. at 1155–56 (emphasis in original). When the consent decree was filed, it was the parties' understanding that § 2 covered more than intentional discrimination. *See* Doc. 81, at 1–2 (recognizing that Plaintiffs "withdr[ew]" their intentional-discrimination claims, but also that Defendants, nevertheless, "admit[ted] liability under § 2 of the Voting Rights Act"). An effective termination of the consent decree is necessary to correct this fundamental misunderstanding.

The consent decree was also based on a misunderstanding of Federal Rule of Civil Procedure Rule 65(d)'s injunction requirements. Consent decrees are a type of injunction because they are enforced by the power of the courts. *See Palestine-Wheatley*, 769 F.3d at 572 (mentioning "an injunction, including a consent decree"). Thus, consent decrees must do "more than order the defendants to obey the law" because that "is not specific enough" under Rule 65(d). *Daniels v. Woodbury County*, 742 F.2d 1128, 1134 (8th Cir. 1984). But one provision of the consent decree

does nothing more than direct Defendants that they "have a continuing obligation to comply with the requirements of [§ 2 of] the Voting Rights Act." Doc. 81, at 6. That provision must be terminated.

What's more, the consent decree was based on a misunderstanding of the scope of judicial power. It purports to apply to nonparties, the Arkansas General Assembly and the Arkansas Judicial Council, Inc., which "make[s] recommendations to the Arkansas General Assembly regarding all proposals for new judgeships and changes in judicial districts." *Id.* at 7. Under the decree, the Judicial Council was required to "convene a Biracial Advisory Committee . . . , comprised of three African American and three white judges." *Id.* And the chair of that committee must "rotate annually between an African American and a white member." *Id.* But, as the Supreme Court has held, "a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986). Because the consent decree purports to obligate nonparties, it was beyond "the court's subject-matter jurisdiction" to enter, *Ctr. for Biological Diversity v. Strommen*, 114 F.4th 939, 943 (8th Cir. 2024) (quoting *Local No. 93*, 478 U.S. at 525), and it must, therefore, be terminated.

## II. Defendants' 35 Years of Good-Faith Compliance with the Consent Decree Independently Requires the Consent Decree to be Terminated.

This Court should also terminate the outdated consent decree because Defendants have substantially complied with it in good faith under *Cody v. Hillard*, 139 F.3d 1197 (8th Cir. 1998), and *Dowell*. Consent decrees are "not intended to operate in perpetuity." *Dowell*, 498 U.S. at 248. That's because courts' "remedial powers are limited to remedying the initial constitutional violation." *Junction City Sch. Dist.*, 14 F.4th at 666. So "when the objects of the decree have been

attained," federal courts must "promptly" give back "to the State and its officials" the "responsibility for discharging the State's obligations." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004).

Accordingly, courts may terminate a consent decree "when a moving party . . . has fully complied" with the decree. *Palestine-Wheatley*, 769 F.3d at 572. In *Cody*, the Eighth Circuit instructed that courts should weigh the following factors when determining whether to terminate a consent decree:

1. "[A]ny specific terms providing for continued supervision and jurisdiction over the consent decree";
2. "[T]he consent decree's underlying goals";
3. The defendants' "compliance with prior court orders";
4. The defendants' "good faith effort to comply";
5. "[T]he length of time the consent decree has been in effect"; and
6. "[T]he continuing efficacy of the consent decree's enforcement."

139 F.3d 1197, 1199 (8th Cir. 1998) (quoting *McDonald v. Carnahan*, 109 F.3d 1319, 1321 (8th Cir. 1997)); *see also id.* ("if district court finds that defendant operating in compliance with Constitution and unlikely to return to 'its former ways,' purposes of injunction have been achieved" (quoting *Dowell*, 498 U.S. at 247)). All six *Cody* factors weigh in favor of terminating the consent decree.

**A. The consent decree's specific terms contemplated federal control ending long ago, and Defendants' decades-long, good-faith compliance with the consent decree requires a return to local control.**

The specific terms of the consent decree and Defendants' good-faith compliance with the consent decree weigh in favor of termination. The first *Cody* factor, which directs courts to look at "any specific terms providing for continued supervision and jurisdiction," *Cody*, 139 F.3d at

1199 (quoting *McDonald*, 109 F.3d at 1321), unquestionably weighs in favor terminating the consent decree. The consent decree's specific terms recognize that Defendants, if they "compl[ied] in a timely fashion with their duties under" the consent decree, have a right to "petition the Court after January 2, 2001, for an end to the Court's jurisdiction over this case." Doc. 81, at 11. That foreseen end to federal supervision makes sense; consent decrees are to be "*temporary* measure[s] to remedy past discrimination." *Dowell*, 498 U.S. 247 (emphasis added). Defendants have complied with the consent decree for 35 years and are now exercising their right, as provided in the consent decree, to petition for termination of the decree. *See, e.g.*, Doc. 107 (in 2002, making "negligible" changes to the original subdistrict boundaries that were then in effect); *Circuit Court Districts*, Arkansas Spaciatial Data Infrastructure Portal, https://arcg.is/1C1reT4 (last visited Nov. 2, 2026) (showing current boundaries for Arkansas circuit court districts); Ex. 3 (overlaying the 2000 Census file with the current circuit court district boundaries, showing that the boundaries are based on the 2000 Census map); Ex. 4 (declaration from Shelby Johnson explaining Exhibit 3's significance and declaring that the boundaries have not been changed to align with subsequent census maps); Ex. 1, at 2–3 (identifying Sixth Judicial Circuit subdistrict judges post-2024 General Election).

Likewise, because Defendants have "compli[ed] with prior court orders" in "good faith" for 35 years, the third (Defendants' "compliance with prior court orders"), fourth (Defendants' "good faith effort to comply"), and fifth ("the length of time the consent decree has been in effect") *Cody* factors also weigh in favor of terminating the consent decree. 139 F.3d at 1199 (quoting *McDonald*, 109 F.3d at 1321); *see Milton v. Huckabee*, No. 88-cv-01142, at 11 (W.D. Ark. Sep 30, 2026) (Order Granting Motion to Terminate Continued Supervision) (finding that the fifth *Cody*

factor weighed in favor of termination "[g]iven the thirty-five-year history of . . . compli[ance] with the various orders entered"). To the extent Plaintiffs might argue that Defendants have deviated from the consent decree's terms because the majority-black judicial subdistricts no longer elect any chancery or juvenile judges, that argument is flawed. As noted above, Arkansas merged the courts of law and equity. *See supra* p. 4. The circuit courts now have jurisdiction over "all matters previously cognizable by Circuit, Chancery, Probate and Juvenile Courts . . . ." Ark. Const. amend. 80, § 19(b)(1). This change required Defendants to reallocate judges among the judicial subdistricts, but after that reallocation, the majority-white and majority-black subdistricts still elect the same number of judges. For example, before the courts of law were merged, the majority-white subdistrict in Judicial District 6 elected 5 circuit judges, 5 chancery judges, and 1 circuit/chancery juvenile judge. Doc. 81, at 4. Now, the majority-white subdistrict elects 11 circuit judges. *See* Ex. 1, at 2–3 (identifying Sixth Judicial Circuit subdistrict judges post-2024 General Election). Similarly, as of the consent decree, the majority-black subdistrict elected 2 circuit judges, 1 chancery judge, 1 circuit/chancery juvenile judge, and 1 to be created circuit/chancery judge. Doc. 81, at 4. Now, the majority-black subdistrict elects 5 circuit judges.[2] *See* Ex. 1, at 2. Accordingly, the reallocation did not dilute African American Voters' "equal access to the political process for electing judges to the trial courts of general jurisdiction in the State of Arkansas." Doc. 81, at 2.

Defendants have thus complied with the consent decree in good faith. Indeed, no one has contended otherwise in the past 35 years and, in any event, only substantial compliance is required. See *Cody*, 139 F.3d at 1199. Even if there were any violations of the consent decree, they would be

[2] The consent decree also provided that one mental health judge would be elected at large. Doc. 81, at 4. Now, one circuit judge in Judicial District 6 is elected at large. *See* Ex. 1, at 2.

"inconsequential" and would not change the analysis or the conclusion. *Id.* The consent decree should be terminated.

### B. The consent decree's underlying goal of creating race-based subdistricts is beyond the Court's authority because it is unconstitutional.

Because the underlying goal of the consent decree—dividing Arkansans into race-based subdistricts—is outside the Courts' authority, the second *Cody* factor likewise weighs in favor of terminating the consent decree. *See Cody*, 139 F.3d at 1199 (listing consideration of "the consent decree's underlying goals" as the second factor (quoting *McDonald*, 109 F.3d at 1321)). Indeed, refusing to terminate an unlawful consent decree would exceed this Court's authority.

The consent decree notably did *not* seek to remedy "intentional discrimination." Doc. 81, at 1. Instead, the decree was based on unevidenced, unintentional "dilut[ion] [of] the voting strength of African American voters." *Id.* at 2. To remedy that, the consent decree appears to have attempted to "give racial groups . . . '[a] roughly proportional'" number of judges by "'systematically divid[ing] the [judicial circuits] into electoral [sub]districts along racial lines.'" *Callais*, 146 S. Ct. at 1163 (Thomas, J., concurring) (first quoting *Gingles*, 478 U.S. at 93 (O'Connor, J., concurring in judgment); then quoting *Holder v. Hall*, 512 U.S. 874, 905 (1994) (Thomas, J., concurring in judgment)). The consent decree "certainly" used "race [ ]as . . . an important factor" when it drew race-based subdistricts, Doc. 93, at 2, but that solution was "not justif[ied]" by § 2, *Callais*, 146 S. Ct. at 1143; *see supra* pp. 9–12. "[T]he Constitution almost never permits the Federal Government or a State to discriminate on the basis of race." *Callais*, 146 S. Ct. at 1152. And race-based electoral districts are particularly "odious" because it "assumes from a group of voters' race that they 'think alike, share the same political interest, and will prefer the same candidates at the polls.'" *Id.* at 1153 (first quoting *SFFA*, 600 U.S. at 208, then quoting *Miller*, 515 U.S.

at 920). That's "racial stereotyping"—plain and simple—and is "at odds with equal protection mandates." *Id.* (quoting *Miller*, 515 U.S. at 920); *see SFFA*, 600 U.S. at 291–92 (Gorsuch, J., concurring) (explaining that sorting based on skin color "rest[s] on incoherent stereotypes" that "pave[] over countless differences in language, culture, and historical experience" (citation modified)).

As with public schools, a perceived "racial imbalance . . . without more" cannot allow the government to classify based on race. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 721 (2007) (quoting *Milliken v. Bradley*, 433 U.S. 267, 280 n.14 (1977)). That's why redrawing an electoral "map solely because it fails to provide a sufficient number of majority-minority districts" violates *both* § 2 and the Constitution. *Callais*, 146 S. Ct. at 1156. Indeed, any application of § 2 that is not aimed at the Constitution's "prohibition on *intentional* discrimination" is improper. *Id.* at 1155 (emphasis in original). Here, Plaintiffs "withdr[ew] their claims of intentional discrimination." Doc. 81, at 1. Thus, there is no appropriate goal underlying the consent decree's race-based subdistricts, and continuing to enforce the race-based subdistricts is beyond the Court's authority.

**C. There is no continuing efficacy in maintaining federally mandated, racially segregated judicial subdistricts.**

Because the Constitution generally prohibits the intentional creation of majority-minority districts, *see Callais*, 146 S. Ct. at 1161–62, there is no continuing efficacy (if there ever was any) in using the consent decree's racially sorted judicial subdistricts, *see Cody*, 139 F.3d at 1199 (listing consideration of "the continuing efficacy of the consent decree's enforcement" as the sixth factor (quoting *McDonald*, 109 F.3d at 1321)). But even if the consent decree was initially justified, any "vestiges" of an underlying constitutional violation "ha[ve] been eliminated to the extent

practicable" after 35 years of compliance with the consent decree. *Dowell*, 498 U.S. at 250. The Court has maintained oversight of Arkansas's elections "for [a] long period[ ] of time . . . absent an ongoing violation of federal law." *Frew ex rel. Frew*, 540 U.S. at 441. The Court should terminate the consent decree so that "responsibility for discharging the State's obligations" can be "returned promptly to the State and its officials." *Id.* at 442; *see Horne v. Flores*, 557 U.S. 433, 453 (2009) ("[T]he longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic processes."). It's time to end the federal courts' indefinite supervision of Arkansas's judicial system.

Dissolving the racially sorted subdistricts is also squarely in the public interest. Currently, Arkansans residing in the affected judicial districts are deprived of the prerogative to vote for all the circuit judges in their judicial district. *See supra* pp. 2–3; Ark. Const. amend. 80, § 17 ("Circuit Judges . . . shall be elected on a nonpartisan basis by a majority of qualified electors voting for such office within the circuit or district which they serve."). Terminating the consent decree is necessary to restore that prerogative.

## Conclusion

For these reasons, the Court should terminate the consent decree and end federal supervision.

Respectfully submitted,

TIM GRIFFIN
Arkansas Attorney General

AUTUMN HAMIT PATTERSON
Solicitor General

SKYLAR BURTON
Assistant Solicitor General

OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, Arkansas 72201
(501) 682-2007
skylar.burton@arkansasag.gov
autumn.patterson@arkansasag.gov

*Counsel for State Defendants*